In re WHITE FARM EQUIPMENT COMPANY, Debtor.

Douglas J. HANSEN, et al., Plaintiffs,

v.

WHITE FARM EQUIPMENT COMPANY, et al., Defendants.

The OFFICIAL CREDITORS' COMMITTEE OF the WHITE FARM EQUIPMENT CO., Intervenor/Third Party Plaintiff,

v.

Douglas J. HANSEN, et al., Third Party Defendants,

and

White Farm Equipment Company, Third Party Defendant.

Bankruptcy No. B80–3363.
Adv. No. B81–0813.

United States Bankruptcy Court, N. D. Ohio.

Sept. 9, 1982.

Robin Phelan, Baker Rector, Haynes & Boone, Dallas, Tex., for defendants White Farm Equipment Co.

Dennis M. O'Dea, Richard Jacobson, Keck, Mahin & Cate, Chicago, Ill., for the Official Creditor Committee of the White Farm Equipment Co.

Brian A. Bash, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, Ohio, for the Employees Creditors Committee of the White Motor Corp.

William H. Baughman, Jr., Squire, Sanders & Dempsey, Cleveland, Ohio, for the White Motor Corp.

Russell C. Brown, Stolpestad, Brown & Smith, St. Paul, Minn., for plaintiffs.

Marc A. Silverstein, Gen. Counsel, TIC Investment Corp., Dallas, Tex., for the TIC Inv. Corp.

## OPINION

MARK SCHLACHET, Bankruptcy Judge.

Arising in the White Farm Equipment Company ("WFE") reorganization case, this adversary proceeding concerns alleged violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001–1461 (1976 & Supp. IV 1980), occasioned when, effective May 1, 1981, WFE and additional defendants [1] discontinued all noncontributory [2] insurance coverages (the "Insurance Benefits") [3] fur-

---

1. The additional defendants are as follows:
 (A) the White Motor Corporation Insurance Plan for Salary Employees ("Welfare Benefit Plan"), including its predecessor plans (see *infra* p. 88);
 (B) the White Motor Corporation ("WMC"), an Ohio corporation which was the parent of WFE until December 19, 1980 when it closed the sale and transferred the capital stock of WFE (see *infra* p. 95);
 (C) the TIC Investment Corporation ("TIC"), a Delaware corporation which entered into a purchase agreement with WMC pursuant to which WMC transferred the capital stock of WFE to White Farm USA, Inc., a wholly owned subsidiary of White Farm Industries, Inc., which, in turn, is a wholly-owned subsidiary of TIC, and also pursuant to which Farm, USA, entered into a further agreement with WMC styled "Assignment and Assump-

tion of Liabilities" whereby Farm, USA, assumed, *inter alia* and with exceptions, WMC's obligations to WFE employees and retirees under the Welfare Benefit Plan (see *infra* p. 95);
 (D) The Equitable Life Assurance Society of the United States ("Equitable"), underwriter of the bulk of the insurance coverages furnished through the Welfare Benefit Plan.

2. "Noncontributory" insurance policies are those for which "the employer pays the entire premium for the employees." Annot., 53 A.L. R.2d 215, 220 (1963).

3. Briefly stated, these insurance coverages comprised group life, medical, surgical, hospital, and dental coverage with prescription drug and hearing aid coverage provided on a self-insured basis. Actual insurance benefits were

nished through defendant White Motor Corporation Insurance Plan for Salary Employees ("Welfare Benefit Plan"), including its predecessor insurance plans, as to the salaried retirees of WFE (the "Retirees") and other beneficiaries thereunder.

Instituted by certain Retirees and surviving spouses of deceased Retirees (the "Plaintiffs"), this proceeding is currently before the Court on the joint motion of WFE and TIC Investment Corporation ("TIC") to dismiss the Plaintiffs' complaint on the ground that, *inter alia,* it fails to state a claim upon which relief can be granted, pursuant to Bankruptcy Rule 712(b); and the Plaintiffs' cross-motion for partial summary judgment on the issue of liability, pursuant to Bankruptcy Rule 756. For reasons set forth *infra,* the Court deems that WFE and TIC's motion should be treated as one for summary judgment and holds that summary judgment be granted thereon in their favor. In addition, the Plaintiffs' motion for summary judgment shall be denied.

BACKGROUND

### A. *Procedural History*

Following the discontinuation of the Insurance Benefits, the Plaintiffs, on June 19, 1981, commenced this adversary proceeding by verified complaint as a class action on behalf of themselves and as class representatives on behalf of the other Retirees, surviving spouses of deceased Retirees, and remaining beneficiaries under the Welfare Benefit Plan. In their complaint the Plaintiffs allege that when the defendants (excepting the Equitable Life Assurance Company of the United States ("Equitable"))

discontinued the Insurance Benefits, they breached their contractual and fiduciary obligations to the Retirees and members of the proposed class under the Welfare Benefit Plan in violation of ERISA, giving rise to a claim against such defendants for retroactive reinstatement of the Insurance Coverages. The Plaintiffs seek a declaratory judgment establishing, in substance, that the Retirees' claim arising out of the discontinuation of the Insurance Coverages is valid under ERISA and allowable in this title 11 case under 11 U.S.C. § 502. The Plaintiffs also seek to enjoin WFE, TIC, and the White Motor Corporation ("WMC") to reinstate, at their expense, the Insurance Benefits retroactively to May 1, 1981.[4]

On July 14, 1981, the Plaintiffs moved for a temporary restraining order and preliminary injunction enjoining the defendants to reinstate the Welfare Benefit Plan as requested in the complaint *pendente lite.* In support, the Plaintiffs submitted two affidavits of individual plaintiffs: (1) the Affidavit of Douglas J. Hansen, a Retiree, dated June 25, 1981 ("Hansen Affidavit I");[5] and (2) the Affidavit of Pearl E. C. Lindhal, surviving spouse of a deceased Retiree, dated July 2, 1981 ("Lindhal Affidavit").

On July 23, 1981 a preliminary hearing was held at which time the parties entertained alternatives within the process of the litigation.[6] Considerable complexities were indicated therein—in particular, class certification, entitlement to preliminary injunctive relief, priority of Retirees' claims upon various given assumptions, and discovery. The Court and the parties agreed to attack as a threshold question the legal sufficiency

furnished to WFE salaried retirees according to the plant at which they were employed.

**4.** Finally, the Plaintiffs request attorney's fees and expenses incurred in the prosecution of this proceeding, pursuant to 29 U.S.C. § 1132(g), Bankruptcy Rule 723, and Fed.R. Civ.P. 23.

**5.** A photocopy of a booklet entitled "Benefits After Retirement For Salary Retirees" is annexed to Hansen Affidavit I as Exhibit A. This booklet was relied upon by the Plaintiffs to

establish the rights and obligations under the Welfare Benefit Plan.

**6.** Also on this date the Official Creditors' Committee of WFE (the "Committee") moved for permission to intervene in the proceeding as an interested party. The Court granted leave to intervene, and, on September 1, 1981, the Committee filed a complaint for a declaratory judgment determining whether the Retirees' claims are valid and allowable under 11 U.S.C. § 502, and, if so, what priority, if any, they are entitled to under 11 U.S.C. §§ 503 or 507.

of the Retirees' claims.[7] If such claims are insufficient, the complexities in the litigation would be avoided. The Court also addressed discovery, with the defendants agreeing to observe an accelerated discovery schedule.

On July 29, 1981, as noted *supra,* WFE and TIC jointly moved to dismiss the Plaintiff's complaint on the ground that, *inter alia,* it fails to state a claim under ERISA, *i.e.,* the discontinuation of the Insurance Benefits and termination of the Welfare Benefit Plan as to the Plaintiffs and the proposed class do not give rise to a claim against the defendants.

On August 13, 1981 [8] a pre-trial conference was held at which the Court and the parties established a procedure for hearing the motion to dismiss. At the Court's direction, notice was afforded all potential class members reciting (1) the pertinent procedural history of the WFE reorganization case and of the instant adversary proceeding (as well as the salient facts of the latter); (2) the claim asserted herein arising out of the discontinuation of the Insurance Benefits; (3) that on September 18, 1981 a hearing was to be held in this adversary proceeding relative to the validity and allowability of such claims pursuant to which the Court may make determinations thereon on a class basis; and (4) that the hearing would be open to all beneficiaries under the Welfare Benefit Plan and that they would be accorded the opportunity to be heard thereat. See Notice to Salaried Former Employees of White Farm Equipment Company.

On September 14, 1981, as noted *supra,* the Plaintiffs filed a cross-motion for partial summary judgment on the issue of liability, together with an annexed statement of facts in support, as to which, they state, "there can be no genuine issue." As additional bases for such motion, the Plaintiffs submitted their verified complaint to be considered as an affidavit and certain enumerated extra-pleading materials: the WFE Schedule of Debts; the Lindhal Affi-

---

7. In the Manual for Complex Litigation (1982) (supplement to C. Wright & A. Miller, Federal Practice and Procedure (1969–1982)), the *Manual's* Board of Editors recommends precertification rulings on special legal questions in like postured cases. Section 0.22, "Classes of Potentially Complex Cases," in part provides:

> Cases of the following types may require special treatment in accordance with the procedures in the *Manual*: . . . (j) class actions or potential class actions, . . .

*Id.* at 4. Section 1.80, "Early Determination of Special Legal Questions," in part reads:

> In some complex cases it becomes apparent at the preliminary pretrial conference or shortly thereafter that the determination of a legal question will expedite the disposition of the cause. This is particularly the case where the nature and scope of discovery and further pretrial proceedings would be substantially affected by the determination of the preliminary legal question. . . .
>
> When it is desirable to expedite the cause, the court should provide an efficient method—including discovery, if desirable—and time schedule for submission and determination of such legal questions.

*Id.* at 85–86 (footnotes omitted). Plainly, the posture of the instant proceeding, described *supra,* renders it suitable for such treatment.

8. Also on this date a hearing was held to consider the adequacy of the information contained in a proposed disclosure statement filed by WFE on June 30, 1981. Shortly before the start of the hearing, the Plaintiffs filed objections thereto consolidated with a motion to postpone approval thereof should the Court overrule such objections. Inadequacies of information, according to the Plaintiffs, arose from the proposed disclosure statement's failure to impart information about, *inter alia,* the Welfare Benefit Plan and WFE's purported duties thereunder to furnish Insurance Benefits, and the pendency of this adversary proceeding with its potential impact upon the finances of WFE and, hence, the feasibility of the proposed plan of reorganization.

Argument was heard and the hearing was continued to August 20, 1981, whereupon the Court approved an amended proposed disclosure statement styled "Consolidated Disclosure Statement, as well as an abridgement thereof, styled Summary Disclosure Statement." See 11 U.S.C. § 1125 (c) ("there may be transmitted different disclosure statements, different in amount, detail, or kind of information, as between classes."). Both disclosure statements make reference to the basic information the Plaintiffs requested be included therein. See Consolidated Disclosure Statement at 38; Summary Disclosure Statement at 33. In any case, the proposed plan of reorganization was accepted by the creditors and the equity security holder, and was confirmed by the Court on October 30, 1981.

davit; Hansen Affidavit I; the Disclosure Statements approved by the Court on August 20, 1981; and the Deposition of James H. Slife, WFE Vice President for Finance and Administration, taken on August 27, 1981 (the "WFE Deposition"), together with all exhibits made a part thereof.[9] Plaintiffs' Motion for Partial Summary Judgment at 2–3.

In their statement of facts, the Plaintiffs made significant representations as to the posture of the proceeding, including that [a] formal, written document known as the White Motor Corporation Insurance Plan for Salary Retirees [sic] *either does not exist or cannot be found.* Rather, the retiree insurance coverage benefits are described and summarized in booklets applicable to various groups of the Salary Retirees identified by plant location. (WFE Deposition, Exhibits 9 to 20) . . .

Plaintiffs' Statement of Facts in Support of Partial Summary Judgment Motion, para. 8 at 3 (emphasis added). The plaintiffs thus viewed discovery as to documents or other materials relating to the Welfare Benefit Plan to have been completed. Reliance is thus properly placed on the above materials for an assessment of the rights of the parties under the Welfare Benefit Plan.

### B. *The Hearing*

As scheduled, on September 18, 1981 a hearing was held wherein the motion to dismiss and the motion for partial summary were considered. At the outset of the hearing, the Court stated its view of the issue presented:

The issue here seems to be whether the employer, the White Farm Equipment Company, may, under applicable law, terminate the welfare benefit plan *described particularly in Exhibit A to [Hansen Affidavit I]* [10] . . . without breaching the rights of those employees who, prior to such termination had retired from White Farm, allegedly 756 employees.

Transcript ("TR.") at 7 (emphasis added). Subsequently, the Court, concerned with the substantial rights of the parties and unaware that "[i]t is not unusual for such an unfunded plan . . . to consist of various booklets and documents issued by the employer to its employees," *Levy v. Lewis*, 635 F.2d 960, 969 (2d Cir. 1980) (Mansfield, J., concurring) (citations omitted), initiated dialogue with Plaintiffs' counsel respecting whether Exhibit A to Hansen Affidavit I sets forth the terms which the Court can assume constitute the arrangement between WFE and the Retirees as to the Welfare Benefit Plan. There was a lack of clarity in Plaintiffs' counsel's response. Sensing the Court's reliance on such materials before it, Plaintiffs' counsel then suggested, for the first time, that the clear language of his own exhibit be deemed immaterial by the Court. Tr. 65.

The Court did not intend to invite or inspire a strategic retreat from the proceedings theretofore painstakingly pursued by the Court and the parties. As detailed *supra,* the Plaintiffs advanced up to that point a fact pattern consisting in substantial measure of a reservation by WFE of the right to amend or terminate the Welfare Benefit Plan. Tr. 11. Thus, while it is true that "[t]he contention of one party that there are no issues of material fact preventing entry of judgment in its favor

---

**9.** The exhibits to the WFE Deposition included (1) insurance premium schedules effective on the date of the Insurance Benefit discontinuation (Exs. 3 & 25); (2) summary plan description booklets and individual benefit brochures (Exs. 5, 6, 19, 20, 21 & 23); and (3) WFE insurance coverage description booklets dated June 1, 1970.

**10.** Such booklet was apparently issued during March or April, 1978. *Compare* Second Affidavit of Douglas J. Hansen, paras. 7 & 8 (filed Sept. 29, 1981) (retiree deposes that the booklet was issued April 19, 1978) *with* WFE Deposi-

tion, Exhibit 21 (the cover letter to the booklet is dated March 23, 1978). On its face, the booklet applies to the Retirees. It outlines the Insurance Benefits and, in compliance with ERISA, sets out the information required of a "summary plan description" within the meaning of 29 U.S.C. § 1022(b). In accordance therewith, the booklet divulges that, as to "Continuance Of The Plan[,] . . . the Company does reserve the right to change the plans, and, if necessary, to discontinue them." Hansen Affidavit I, Exhibit A, para. 13 at 16.

does not bar that party from asserting that there are issues of fact sufficient to prevent the entry of judgment against it," *Schwabenbauer v. Board of Education of City School District of City of Olean,* 667 F.2d 305, 313 (2d Cir. 1981) (*citing Walling v. Richmond Screw Anchor Co.,* 154 F.2d 780, 784 (2d Cir.), *cert. denied,* 328 U.S. 870, 66 S.Ct. 1383, 90 L.Ed. 1640 (1948)), such latitude does not warrant the selective disputation of one's own factual assertions.

Alternatively, Plaintiffs' counsel asserted that consideration of the existence of such clause by the Court was premature because the defendants had allegedly failed in whole or in part to comply with the Plaintiffs' requests for discovery. *E.g.,* Tr. 35. In response to the Court's pointed question as to which "principal" documents had not yet been produced, Plaintiffs' counsel indicated the insurance policies constituting the Welfare Benefit Plan and the supposed master Welfare Benefit Plan document(s). Tr. 112–13. Thereupon, the Court ordered WFE to produce those insurance policies and WMC to search for and produce, if uncovered, any master Welfare Benefit Plan document or documents of that nature, following which Plaintiffs' discovery requests would be deemed wholly satisfied. Tr. 116–17. Apparently still dissatisfied, Plaintiffs' counsel indicated that, should the Court deem the termination clause to be material, discovery as provided for by the Court was insufficient for its consideration. Tr. 125. The Court rejoined that, since the Plaintiffs assert in part a contractual claim and since the alleged termination clause would, if proved, be a contractual provision therein, the idea that Plaintiffs' counsel had not thought it material or potentially so is simply "unacceptable." Tr. 125. Thereupon, Plaintiffs' counsel stated he was withdrawing the motion for partial summary judgment and would proceed in opposition to the motion to dismiss. Tr. 126.

Deferring ruling on the propriety of the purported withdrawal, the Court once again took representations from counsel for WFE and WMC about their respective compliances with the Plaintiffs' discovery requests and also whether the Welfare Benefit Plan administrator, as a separate entity, possesses any relevant documents. Counsel for WFE reiterated that WFE is the plan administrator and that all conceivably relevant documents in the possession of WFE had been turned over to the Plaintiffs' counsel except for the insurance policies, which, having just came into his possession, would be turned over to Plaintiffs' counsel, though of dubious relevance to the matter at bar. Tr. 130–32. The Court asked Plaintiffs' counsel once again what other discovery procedures he thought necessary beyond the production of the insurance policies. Tr. 133. Plaintiffs' counsel reiterated the search for the supposed master Welfare Benefit Plan document by WMC and a formal representation therefrom as to its search. *Id.* Counsel for WMC agreed to comply with such request. Tr. 133–34. After colloquy between the Court and counsel about the appropriateness of converting the motion to dismiss into one for summary judgment, wherein the Court indicated that such was under consideration, and other matters irrelevant hereto, the hearing was adjourned.

### C. *Post Hearing Submissions and Factual Contentions*

After the hearing, the Plaintiffs filed on September 29, 1981 certain additional materials: the Second Affidavit of Douglas J. Hansen in Opposition to White Farm Equipment's Motion to Dismiss ("Hansen Affidavit II") with annexed exhibits; the Affidavit of Russell C. Brown in Opposition to WFE's Motion to Dismiss ("Brown Affidavit"), counsel to the Plaintiffs, also with annexed exhibits; the WFE Deposition [11]; certain discovery motions; a Notice of Withdrawal of Partial Summary Judgment Motion; and the Plaintiffs' Second Reply Memorandum in Opposition to WFE's Motion to Dismiss ("Plaintiffs Second Reply Memorandum").

In the Plaintiffs' Second Reply Memorandum, they raise for the first time a dispute

---

11. See *supra* note 9.

as to the existence of a termination clause with respect to certain of the Retirees as well as to the construction to be given the termination clause in the summary plan description booklet (Hansen Affidavit I, Exhibit A; Hansen Affidavit II, Exhibit 2; WFE Deposition, Exhibit 5), which clause, they admit, exists. Plaintiff's Second Reply Memorandum at 13. First, the Plaintiffs allege that before the issuance of the summary plan description booklet in March or April, 1978, two booklets both entitled "Your Group Insurance Plan" and both dated June 1, 1970 (WFE Deposition, Exhibits 17 & 18, Hansen Affidavit II, Exhibit 1), "described the insurance coverages for all employees of WFE at least for the period dating back to June 1, 1970." Plaintiffs' Second Reply Memorandum at 11. Such booklets, the Plaintiffs allege further, do not contain a termination clause. Therefore, according to the Plaintiffs, as respects Retirees who retired before the issuance of the summary plan description booklet, the Welfare Benefit Plan or predecessor plan does not contain a termination clause similar to that in the summary plan description booklet. Plaintiffs' Second Reply Memorandum at 11.

Taking their argument yet further, Plaintiffs point to certain language in the summary plan description booklet reflecting that the level of benefits for certain types of Insurance Benefits were frozen for Retirees who retired from a closed or discontinued operation. Affidavit II, Exhibit 2 at 3, 5. Plaintiffs allege that, in view thereof, the termination clause is reasonably susceptable of a construction limiting its application only to current WFE employees and not to the Retirees. Plaintiffs' Second Reply Memorandum at 13. Accordingly, should the Plaintiffs' view of the materials setting forth the arrangement between the parties be adopted, no termination clause would be found to exist *vis-a-vis* the Retirees. At a minimum, the Plaintiffs contend, the foregoing establishes that a genuine issue exists as to how the termination clause should be construed and, indeed, whether a termination clause exists at all with respect to Retirees who retired prior to March or April, 1978.

As an additional basis for declining to find as a matter of fact that a termination clause does indeed exist, the Plaintiffs contend that discovery is incomplete. This is so, they contend, because during the WFE Deposition Mr. Slife was unable to answer, for want of knowledge, many of the questions put to him nor could he indicate where the sought after information might be obtained. Also, the absence of more ample documentation relating to the Welfare Benefit Plan produced by WFE or WMC, according to the Plaintiffs, admits of only one of two possible explanations: (1) inadequate searches were made by WFE and WMC or (2) "the documents are being withheld." Plaintiffs' Second Reply Memorandum at 25. Therefore, the Plaintiffs conclude, should the Court deem the termination clause material, it should defer making findings with respect thereto until further discovery is had. *Id.*

Not surprisingly, in their own post hearing memoranda WFE and the Committee reject that view of the facts and of discovery. Both of them cite certain language in the 1970 Group Insurance Plan Booklets as amounting to the reservation by WFE of the power to terminate the Insurance Benefits:

WHEN INSURANCE TERMINATES

Your insurance terminates when you leave our employ, when you are not longer eligible or when the group policy terminates, whichever happens first.

WFE Deposition Exhibit 17 at 34; *id.*, Exhibit 18 at 33; Hansen Affidavit II, Exhibit 1 at 33. WFE and WMC reiterate that all documents in their possession requested by the Plaintiffs have been produced. WFE's Response to Plaintiffs' Second Reply Memorandum, para. 7 at 8; Letter of WMC (filed October 28, 1981).

### D. *The Motions*

■■ As indicated supra, the motion to dismiss is ripe for conversion to one for summary judgment. Fed.R.Civ.P. 12(b) reads in pertinent part as follows:

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Thus, where, as here, a court has accepted extra-pleading materials, including affidavits and depositions, and considered them in connection with a motion to dismiss a complaint for failure to state a claim, such motion must be converted to one for summary judgment. *Dayco Corp. v. Goodyear Tire and Rubber Co.,* 523 F.2d 389, 392 (6th Cir. 1975); *accord Townsend v. Columbia Operations,* 667 F.2d 844, 849 (9th Cir. 1982); *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 711 n. 5 (D.C.Cir.1977); *see also* 2A J. Moore, *Moore's Federal Practice* ¶ 1209[3] at 2302 (2d ed. 1982). In addition, the *Dayco* court instructs that when a motion to dismiss has been so converted, "the 10 day requirement of Rule 56(c) [should be read] into the Rule 12(b) 'reasonable opportunity' to file supplemental materials." *Id.* at 392. Herein, counsel for Plaintiffs was advised by the Court that conversion was under consideration and indeed has been afforded every opportunity to submit materials. Moreover, the Plaintiffs themselves filed a motion for partial summary judgment four days before date on which WFE and TIC's motion to dismiss was scheduled to be heard. Hence, the employment of summary procedure at this stage of the proceedings works no "unfair surprise" upon the Plaintiffs. *See id.* at 393.

▇ Plaintiffs' untimely effort to withdraw their Rule 56 motion raises a question of practice. While this precise question may not have federal precedent, *D'Addio v. McNab,* 73 Misc.2d 59, 342 N.Y.S.2d 342 (Sup.Ct.1973), wherein movant's request for leave to withdraw a motion for a temporary injunction was denied, sheds light on the issue. *D'Addio* stated that after a motion is submitted, either by making oral argument thereon or the filing of moving papers, it may not be withdrawn in the absence of consent of all parties or leave of court. *Id.* 342 N.Y.S.2d at 345–46 (*citing Heaberkorn v. Macrae,* 36 Misc.2d 1072, 233 N.Y.S.2d 793, 795 (Sup.Ct.1962); and *Wallace v. Ford,* 44 Misc.2d 313, 253 N.Y.S.2d 608, 610 (Sup.Ct.1964)). Noting that the movant failed to procure the consent of the non-moving parties, the *D'Addio* court denied his request for withdrawal and proceeded to consider the motion on its merits. *Id.* 342 N.Y.S.2d at 346.

In the instant proceeding, counsel for Plaintiffs presumes that he may file a motion with the Court, have it pre-tried, argue it at great length, and then, after sensing that the Court considers it disfavorably, notice a withdrawal of it without procuring nor even seeking either the consent of the parties or leave of court. Such disorderly practice not only is an affront to the Court but, if sanctioned, would play havoc with motion practice for the most obvious of reasons: motions would take on an ephemeral character at the whim and caprice of the movant. In view of the foregoing, the Court, adopting the reasoning of *D'Addio,* holds that the Plaintiffs' purported withdrawal of the motion for partial summary judgment is a nullity. Accordingly, such motion is still before the Court for consideration on the merits.

Thus the Court has before it cross-motions for summary judgment. The principles for granting summary judgment are well settled. Fed.R.Civ.P. 56(c) provides in pertinent part:

> The judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of [substantive] law.

Indeed, "[a] summary judgment is a judgment in bar that results from an application of substantive law to facts that are estab-

94

lished beyond reasonable controversy." 6 J. Moore, *Moore's Federal Practice* ¶ 56.-11[1][1.–0] (2d ed. 1982). "[T]he moving party always has the initial burden of showing the absence of a genuine issue of material fact and that he is entitled to judgment as a matter of law." *Felix v. Young,* 536 F.2d 1126, 1134 (6th Cir. 1976); *see also* 6 J. Moore, *Moore's Federal Practice and Procedure* ¶ 56.15 [1,–00] (2d ed. 1982). "To satisfy his burden the movant must make a showing that is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact." *Fitzke v. Shappell,* 468 F.2d 1072 at 1078 n. 8 (6th Cir. 1972) (*quoting* 6 J. Moore, *Moore's Federal Practice* ¶ 56.15[3] at 335–6 (2d ed. 1972)). "The opposing party enjoys having the evidence viewed in the light most favorable to him, *New Jersey Life Ins. Co. v. Getz,* 622 F.2d 198, 200 (6th Cir. 1980), as well as having all factual inferences drawn against the movant and in his favor. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Accordingly, "the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated." *Tee-Pak, Inc. v. St. Regis Paper Company,* 491 F.2d 1193, 1195 (6th Cir. 1974) (*quoting* J. Moore, *Moore's Federal Practice* ¶ 56.13[3] at 2123–26 (2d ed. 1962)).

 The Court is mindful, moreover, that simply because both sides have moved for summary judgment, the Court is not warranted "in granting summary judgment unless one of the parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed." *Hart v. Johnson,* 389 F.2d 239, 241 n. 2 (6th Cir. 1968) (*quoting* 6 J. Moore, *Moore's Federal Practice* ¶ 56.13 at 2247 (2d ed. 1968)). As stated in *Begnaud v. White,* 170 F.2d 323, 327 (6th Cir. 1946):

> The fact that both parties make motions for summary judgment, and each contends in support of his respective motion that no genuine issue of fact exists, does not require the court to rule that no fact issue exists. Each, in support of his own motion, may be willing to concede certain contentions of his opponent, which con-

cession, however, is only for the purpose of the pending motion. If the motion is overruled, the concession is no longer effective. Appellants' concession that no genuine issue of fact existed was made in support of its own motion for summary judgment. We do not think that the concession continues into the court's separate consideration of appellee's motion for summary judgment in his behalf after appellants' motion was overruled.

Hence, a movant may have judgment rendered in his favor only if he has sustained his considerable burden. Once a movant has satisfied his burden, however, "the party opposing the motion must present facts in their proper form—conclusions of law will not suffice." 6 J. Moore, *Moore's Federal Practice* ¶ 56.15[3] at 56–485 (2d ed. 1982); *accord Felix v. Young, supra,* at 1135 ("When the initial burden has been supported by additional materials, the non-moving party must then come forward with specific facts which demonstrate to the Court that there is a genuine issue for trial.").

### E. *Findings of Fact*

Except for the matter of the existence and scope of the termination clause(s), the salient facts are undisputed. Formed in 1969 by merger of two wholly-owned subsidiaries of WMC, Minneapolis Moline, Inc. and the Oliver Corporation, WFE has historically been engaged in the manufacture and distribution of farm equipment and related parts and accessories as well as materials-handling equipment. During April, 1980 WFE suspended its manufacturing operations in the face of lagging sales and insufficient working capital.

On September 4, 1980 WFE voluntarily petitioned for reorganization pursuant to chapter 11 of the Bankruptcy Reform Act of 1978 (the "Code"). As WMC and four other of its wholly-owned subsidiaries also voluntarily petitioned for reorganization on that date, the WFE reorganization case is one of six related reorganization cases. Pursuant to an order of the Court, these reorganization cases were jointly adminis-

tered for procedural purposes only. Since the filing of the chapter 11 petition, WFE has continued to operate its business and manage its properties as debtor-in-possession pursuant to section 1108 of the Code.

On November 18, 1980 WMC entered into an agreement with TIC whereby TIC agreed that it or its subsidiaries would purchase from WMC, *inter alia*, all of the outstanding capital stock of WFE. On December 10, 1980 the Court entered an order approving such purchase agreement, which order also severed the WFE reorganization case from the affiliated cases. On December 19, 1980, the conditions to the execution of the purchase agreement having been met, all of the outstanding capital stock of WFE was transferred to White Farm, U.S.A., Inc., a wholly owned subsidry of White Farm Industries, Inc., which is a TIC subsidiary. At closing, pursuant to the provisions of the purchase agreement, White Farm, U.S.A., Inc. executed a further agreement styled "Assignment and Assumption of Liabilities" whereby it assumed, among other liabilities, those of WMC to WFE retirees arising out of the Welfare Benefit Plan, except to WFE retirees who were participants in the Minneapolis-Moline Hourly Pension Plan. Purchase Agreement, Exhibit C para. 2 at 2.

WFE continued for a time to subsidize the Insurance Benefits. WFE Deposition, Exhibit 1. On March 31, 1981, however, WFE notified the Retirees by letter that the Insurance Benefits would be discontinued effective May 1, 1981 and that identical insurance coverages would be made available on a fully contributory basis. WFE Deposition, Exhibit 2. As indicated, on May 1, 1981 WFE discontinued the Insurance Benefits as to the Retirees and terminated the Welfare Benefit Plan.

During the stock sale negotiations, the Committee, TIC, the International Union, United Automobile Aerospace and Agricultural Implement Workers (the "UAW"), and other interested parties began negotiating a plan of reorganization with WFE. On June 30, 1981 WFE filed a proposed plan of reorganization together with the disclosure statement discussed previously. The aggregate amount of claims against WFE as of July 31, 1981 is estimated by WFE to be in excess of $110 million. WFE Consolidated Disclosure Statement, Exhibit C. Of this amount, approximately $96.5 million reflects nonpriority general unsecured claims. *Id.* The plan provides for a dividend in cash of 65% of the allowed amount of such claims upon confirmation. WFE's Amended Plan of Reorganization at 5. Of the $96.5 million, over $60 million represent contingent claims in product liability cases. WFE Consolidate Disclosure Statement, Exhibit C.

At their discontinuation, WFE's estimated total expense to provide the Insurance Benefits was approximately $960 thousand a year. WFE Deposition at 37, 81. According to the Plaintiffs' estimate, the present value of the Insurance Benefits is approximately $10.3 million. Plaintiffs' Statement of Facts in Support of Partial Summary Judgment Motion at 3–4. The $10.3 million is an amount equal to 56% of the "hard" claims (aggregate claims with products liability claims reduced to 10% of asserted amount).

■ Before assessing the evidence to determine whether a genuine issue exists as to the existence and construction of the termination clause(s), the Court will first make findings as to the Plaintiffs' untimely contention that discovery on that topic remains incomplete. Where, as here to a qualified extent, whatever documents may exist are mainly within the knowledge or control of the movant, the opposing party must be afforded a reasonable opportunity to utilize discovery to gain access to proof. *See Littlejohn v. Shell Oil Company,* 456 F.2d 225, 229 (5th Cir. 1971); *see also* 6 (pt. 2) J. Moore, *Moore's Federal Practice and Procedure* ¶ 56.15[5] at 56–566 (2d ed. 1982).

■ According to the Plaintiffs, discovery is incomplete because Mr. Slife was unable to answer many of the questions posed to him during the WFE Deposition and because it appears incongruous that, in view of the lengthy duration of the Welfare Benefit Plan, such documents as have been

proffered here are all the Welfare Benefit Plan documents extant. The latter point prompted Plaintiffs' counsel to opine that "[t]here is no doubt . . . that an inadequate search for documents has been made by WFE and WMC or that documents are being withheld." Plaintiffs' Second Response Memorandum at 25.

The Court, however, is not of that opinion. Plaintiffs' counsel's sensibilities aside, not one iota of probative evidence before the Court supports the Plaintiffs' contention. In fact, the countervailing evidence is both uniform and substantial. First, as noted *supra,* both WMC and WFE have stated in open court as well as in writing that, following an adequate search, they supplied all requested documents and information in their possession to Plaintiffs' counsel. WFE's Response to Plaintiffs' Second Reply Memorandum at 8; Letter of WMC (filed October 13, 1981); Tr. 110–11, 122.

Second, the previously quoted language from *Levy v. Lewis,* as well as the WFE position that a formal Welfare benefit plan document is often not a concomitant to a welfare benefit plan (Tr. 123), supports the Court's thinking that, given the searches already made, the master Welfare Benefit Plan is a phantom. In any case, the Court is convinced that further search therefor would prove fruitless and that the insurance coverage description booklets must be relied upon as setting forth the rights and obligations under the Welfare Benefit Plan and its predecessor plans.

Third, the questions posed by Plaintiffs' counsel which Mr. Slife declined to answer for lack of knowledge did not relate principally to entitlements of the Retirees under the Welfare Benefit Plan nor its predecessor plans. Rather, they related to the types and levels of insurance coverages conferred upon the various Retirees, *e.g.,* WFE Deposition at 6, and the deliberations of the WFE corporate officers that led to the termination of the Welfare Benefit Plan, WFE Deposition at 28–28. Indeed, as to entitlements, the crux of this adversary proceeding, the documents and materials relating

thereto were supplied. In any event, WFE's counsel conceded at the deposition that the decision to terminate the Welfare Benefit Plan was animated by a desire to cut costs, which fact the Plaintiffs proffered to the Court. Plaintiffs' Statement of Facts in Support of Partial Summary Judgment Motion para. 10 at 3. Moreover, apparently no other current employee of WFE is possessed of more knowledge about this area than Mr. Slife. WFE Deposition at 58–60.

Finally, and most importantly, the plain language of the various insurance coverage description booklets, contrary to the belated contention of the Plaintiffs, does not admit of a construction other than that WFE retained the unqualified power to terminate or amend the Insurance Benefits under the Welfare Benefit Plan. This aspect of the discovery issue dovetails with the factual issues surrounding the termination clause(s) and, accordingly, these matters shall be examined conjointly.

■ A framework for the analysis of the Welfare Benefit Plan and the descriptive materials relating thereto is provided by Exhibits 3 and 25 to the WFE Deposition, both entitled "Insurance Premium Schedule for All Salaried Retirees, Effective 5–1–81." They reflect that by such time the various WFE plants were classified into one of eight "Coverage Codes," and that insurance coverages were conferred on the Retirees in accordance with the Coverage Code under which their respective plants were classified. Of the insurance coverage descriptions, the summary plan description booklet (WFE Deposition, Exhibit 5; Hansen Affidavit I, Exhibit A; Hansen Affidavit II, Exhibit 2), applied to Coverage Codes 1, 3, 7, and 8. WFE Deposition at 88. Single summary plan descriptions (WFE Deposition, Exhibits 19 and 20) were issued to employees classified under Coverage Codes 4 and 5 respectively. WFE Deposition at 87. But Mr. Slife was unable to indicate with authority which booklets applied to Coverage Codes 2 and 6. WFE Deposition at 102. No gap arises, however, as to the insurance coverage description materials

because two booklets, both entitled "Your Group Insurance Plan" and both dated June 1, 1970, when read in tandem describe the insurance plan for all WFE salaried employees going back at least to the issuance date. Brown Affidavit para. 4 at 2.

The Group Insurance Plan booklets are organized into four parts: (I) the Certificate of Insurance, (II) a description of all insurance coverages then provided excepting long term disability coverage, (III) noncontributory long term disability coverage, and (IV) contributory long term disability coverage. At the conclusion of Part II, under the heading of "GENERAL INFORMATION", the following appears:

WHEN INSURANCE TERMINATES

Your insurance terminates when you leave our employ, when you are no longer eligible or *when the group policy terminates,* whichever happens first.

WFE Deposition, Exhibit 17 at 34; *id.,* Exhibit 18 at 33 (emphasis added). Indeed that the WFE employees and retirees enjoyed the insurance coverages subject to the reservation by WFE of the power to terminate any or all of them is expressed throughout each booklet. In part I of each booklet the description of group life insurance coverage contains the following:

Protection after termination

. . . .

B. If your Group Life insurance terminates because *the Group policy is terminated or amended,* . . . . you may also make application to convert your Group Life insurance to an individual Life insurance policy. . . .

*Id.,* Exhibit 17 at 5 (emphasis added); *id.,* Exhibit 15 at 4 (emphasis added). To the same effect, the description of the "Survivor Income" benefits in each booklet contains the following information:

Protection After Termination of Survivor Income Benefits

. . . .

B. If you die . . . following termination of insurance because of termination of your employment in the class or classes of employees insured under the Group Policy, or *because the Group policy is termi-*

*nated or amended,* Survivor Income Benefits will be payable. . . .

*Id.,* Exhibit 17 at 6 (emphasis added); *id.,* Exhibit 18 at 5 (emphasis added). Similarly, in each booklet the description of "Major Medical Expense Insurance" admonishes as follows:

MODIFIED BENEFITS AFTER TERMINATION OF INSURANCE

If a person's insurance terminates *due to termination of the Major Medical Expense Insurance or its amendment to terminate the class of insured persons of which such person is a member,* all Major Medical Expense benefits will cease on the date of such termination. . . .

*Id.,* Exhibit 17 at 30 (emphasis added); *id.,* Exhibit 18 at 29 (emphasis added). Like admonishments appear in each booklet's description of contributory and noncontributory long term disability coverage. *Id.,* Exhibit 17 at 42 & 50; *id.,* Exhibit 18 at 41 & 44.

The foregoing review of the Group Insurance Booklets reveals that they speak with one unambiguous voice that the insurance coverages are subject to termination by WFE. First, the clear terms of the booklets incontrovertibly state as much. Second, such termination power must, *a fortiorari,* be reserved since the insurance plan provides its participants whose coverages are terminated with limited forms of interim coverage. Indeed it is incongruous to postulate that such interim coverage can exist with an absolute entitlement to undiluted insurance coverages upon and after retirement. Finally, had WFE intended to exempt their retirees from such eventuality, they would have indicated so. In light of the unambiguously expressed power to terminate before the Court, the truth is quite clear that no immunity was accorded the Retirees and, hence, the ineluctable conclusion is that the power to terminate embraces the Retirees as well as the current employees, and further discovery thereon is unwarranted.

As noted previously, the Plaintiffs admit that the summary plan description booklet

(WFE Deposition, Exhibits 5, 19 & 20; Hansen Affidavit I, Exhibit A; Hansen Affidavit II, Exhibit 2) contains a termination clause, yet they contend that the construction of the clause should be sculpted so as to exclude the Retirees from its purview. The termination clause therein reads quite simply:

Continuance Of The Plan

The Company fully intends to continue your plans indefinitely. However, the Company does reserve the right to change the Plans, and, if necessary, discontinue them . . . .

*E.g.,* Hansen Affidavit II, Exhibit 2 para. 13 at 16. In support of their proffered construction, the Plaintiffs point to other language in the summary plan description booklet pertaining to levels of life insurance and health care benefits. Specifically, the booklet states that if an employee retires from a closed or discontinued operation, his life insurance and health care benefits are "frozen at the level in effect at retirement." *E.g.,* Hansen Affidavit II, Exhibit 2 at 3, 5. Since relative levels of benefits are wholly unrelated to entitlements thereto, such argument is patently infirm.

In this regard the Plaintiffs also contend that the phrase "if necessary" conditions the exercise of the termination clause upon the showing of "necessity," and that such showing has not been made rendering this a factual issue that may be properly resolved only at trial. Again, this is a Procrustean effort by the Plaintiffs to harmonize the termination clause with their position. Reading this sentence as an integrated whole, the Court notes that no similar expression appears before the phrase "change the plans," *i.e.,* altering the types and levels of coverages. Following the Plaintiffs' line of argument, then, one could infer that while it would be entirely proper for WFE to eliminate coverages or reduce benefit levels at will, WFE could not terminate the Welfare Benefit Plan altogether. Such a conclusion approaches absurdity.

One clear, coherent rationale for the expression emerges when the phrase is read in the context of the termination clause. At the outset, WFE indicates it "fully intends" to confer the Insurance Benefits upon the Retirees indefinitely. At the same time, the next sentence cautions, circumstances may arise whereby WFE in the exercise of its business judgment may elect to modify or terminate the Welfare Benefit Plan. Accordingly, the Welfare Benefit Plan participants are forewarned that WFE may eventually exercise this power. The termination clause admits of no reading other than the foregoing and the Plaintiffs' speculation that at trial a condition to the exercise of the termination power would be proved is untenable. As such, the existence of the phrase does not preclude the Court from finding as a matter of fact that the summary plan description booklets contain, as do the Group Insurance Plan booklets, the reservation by WFE of an unqualified power to amend or terminate the Welfare Benefit Plan. There being no genuine issue as to the existence or construction of the termination clause, the Plaintiffs cause now appears to turn on whether ERISA disallows the exercise of such clauses against retirees.

CONCLUSIONS OF LAW

As indicated *supra,* the Plaintiffs allege that WFE's discontinuation of the Insurance Benefits constitutes a breach of both its contractual obligations and its fiduciary obligations to the Plaintiffs under the Welfare Benefit Plan in violation of ERISA. The contractual claim rests wholly on the contention that under ERISA the Court is duty-bound to fashion a rule of decision, *i.e.,* create federal common law [12], which would adopt the following pre-ERISA rule enunciated by the Supreme Court of Ohio in *Sheehy v. Seilon, Inc.,* 10 Ohio St.2d 242, 243, 227 N.E.2d 229 (1967):

where an employee has complied with the conditions of his contract of employment,

---

12. The Court uses the term "federal common law" to mean "federal rules of decision where the authority for a federal rule is not explicitly or clearly found in federal statutory or constitu-

tional command." P. Bator, D. Shapiro, P. Mishkin & H. Wecheler, *Hart and Wechsler's The Federal Courts And The Federal System,* at 770 (2d ed. 1978).

benefits have been promised and conferred on him by his employer as an inducement for the continuance of his service to the employer, and such employee reaches the specified retirement age, he acquires, by the promise and agreement of his employer, a vested right to those benefits, and, in the absence of good and sufficient causes for forfeiture, he may not be deprived thereof, notwithstanding a proviso in the contract of employment to the contrary.

To reach this result, the Plaintiffs advance an extensive argument: At the outset, they acknowledge that Congress, by enacting ERISA, decided to "occupy the field" of employee benefit plans,[13] preempting state law to the broadest extent possible. *Wadsworth v. Whaland,* 562 F.2d 70 (1st Cir. 1977), *cert. denied,* 435 U.S. 980, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978). As part and parcel of the total federal occupation of this field, the Plaintiffs continue, the legislative history of ERISA indicates that Congress empowered the Courts to fashion federal rules of decision to regulate aspects of employee benefit plans as to which the provisions of ERISA provide no regulation. *Wayne Chemical Inc. v. Columbus Agency Service Corp.,* 426 F.Supp. 316 (N.D.Ind.), *modified,* 567 F.2d 692 (7th Cir. 1977) (trial court erred in ruling that the insurance plan *sub judice* was an employee welfare benefit plan as defined by ERISA). This necessary antecedent to the duty to create federal common law, *i.e.,* ERISA's silence regarding the vesting of welfare benefits upon retirement, is in turn posited by the Plaintiffs. Accordingly, they continue, the courts are commanded to fashion a federal rule of decision to regulate this aspect of welfare benefit plans. *Id.* For the source of this federal rule of decision, the Plaintiffs conclude, the courts, guided by the purely remedial purposes of ERISA, should look to the *Sheehy* rule as it affords maximum protection to welfare plan participants. *See Wayne Chemical Inc. v. Columbus Agency Service Co., supra,* at 325 (*citing Zdanok v. Glidden Co.,* 327 F.2d 944 (2d Cir.), *cert. denied,* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964)).

On the other side, WFE and the Committee strenuously differ with the Plaintiffs' characterization of the matter at bar as one that obliges the Court to create federal common law. Although they concur with the Plaintiffs' postulates that by enacting ERISA, Congress elected to occupy the field of employee benefit plans and that under ERISA the courts may be called upon to create federal common law to fill in interstices, WFE and the Committee argue that ERISA intentionally does not require the vesting of employee welfare benefit plan benefits during the participant's tenure of employment or thereafter and, therefore, in this regard there exists no gap in ERISA.

This intention of Congress, in the view of WFE and the Committee, is expressed in several sections of ERISA. Primary reliance is placed on ERISA § 201(1), 29 U.S.C. § 1051(1) which expressly exempts employee welfare benefit plans from the vesting and participation standards. Secondly, they note that ERISA § 403(d)(2), 29 U.S.C. § 1103(d)(2), which provides in part that "[t]he assets of a welfare plan which terminates shall be distributed in accordance with the terms of the plan," plainly contemplates the termination of welfare plans. Finally, the Committee in particular calls the Court's attention to certain regulations promulgated by the Secretary of the Treasury in connection with qualified plans (deferred compensation plans entitled to favorable tax treatment) under section 411 of Title 26, substantially

---

13. An "employee benefit plan" is defined under Section 3(3) of ERISA, 29 U.S.C. § 1002(3), as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." An "employee welfare benefit plan," under Section (3)(1) of ERISA, 29 U.S.C. § 1002(1), in turn "means any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer ... to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment ...."

identical to sections 203 and 204 of ERISA, 29 U.S.C. §§ 1053, 1054 (minimum vesting standards and benefit accrual requirements respectively), pursuant to ERISA § 3002(c), 29 U.S.C. § 1282(c), as augmented by Reorganization Plan No. 4 of 1978, 43 Fed.Reg. 47713 (1978). Under ERISA § 3002(c) such Regulations apply equally to the minimum vesting standards of subchapter I, part 2, and in part provide:

(a) *In general.* A plan is not a qualified plan ... unless—

. . . .

(3) The plan satisfies the requirements of—

(A) Section 411(a)(2) and § 1.411(a)–3 (relating to vesting in accrued benefit derived from employer contributions)

Treas.Reg. § 1.411(a)–1(a)(3)(A) (1981). The Regulations confine the term "accrued benefit" to pension or retirement benefits, *i.e.,* not welfare benefits:

In general, the term "accrued benefits" refers only to pension or retirement benefits. Consequently, accrued benefits do not include ancillary benefits not directly related to retirement benefits such as payment of medical expenses (or insurance premiums for such expenses), disability benefits not in excess of the qualified disability benefit . . ., life insurance benefits payable as a lump sum, incidental death benefits, current life insurance protection, or medical benefits, or medical benefits described in section 401(h).

Treas.Reg. § 1.41(a)–7(a)(1)(ii) (1981). Thus, according to the Committee, under ERISA welfare benefits bestowed through a pension plan do not vest at any time unless the benefit plan so provides. So, the Committee reasons, where, as here, welfare benefits are bestowed outside the context of a pension plan, they necessarily do not vest unless the plan so provides and, hence, the matter at bar does not serve as an instance where the Court must look beyond ERISA for the rules of decision.

The Plaintiffs' fiduciary claim [14] presumes that the fiduciary duties set forth in ERISA § 404(a)(1)(A)(i), 29 U.S.C. § 1104(a)(1)(A)(1), which provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (1) providing benefits to participants and their beneficiaries," imposes a fiduciary obligation upon WFE as the plan administrator to continue the Welfare benefit Plan indefinitely, *i.e.,* were a fiduciary to terminate a welfare plan, he would not be discharging his duties "solely in the interest of the participants and beneficiaries," nor "for the exclusive purpose of providing benefits" thereto in that plan termination is not in the Plaintiffs' "interests."

WFE and the Committee reject this construction of ERISA, citing numerous cases which declined to hold that the "Fiduciary Responsibility" sections of ERISA tack on additional vesting requirements. *E.g., Levy v. Lewis, supra,* at 968. They argue further that, since other provisions of ERISA expressly address plan termination, ERISA manifestly contemplates same. Seen thus, the Plaintiffs' proffered construction would work a result incompatible with the thrust of the statute.

ERISA derives from a three year study of the private pension system initiated during the 91st Congress by the Senate Committee on *Labor and Public Welfare.* 120 Cong.Rec. S 15737 (1974) (statement of Sen. Harrison A. Williams, Jr.,) *reprinted in* 1974 U.S. Code Cong. & Ad. News 5177. It was based upon Congressional findings which included "that the continued well-being and security of millions of employees are directly affected by these plans; [and] that despite the enormous growth in such plans many employees with long years of employ-

---

14. The Plaintiffs also claim that WFE, as plan administrator and fiduciary, may not exercise a termination clause if it is ambiguous, that the instant termination clauses are in fact ambiguous, and that, therefore WFE breached its fiduciary obligations under ERISA. Suffice it to note that the Court found *supra* that the termination clauses are unambiguous and are here construed according to their clear terms. In view thereof, WFE, by terminating the Welfare Benefit Plan, breached no fiduciary obligation as asserted.

ment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans.... " ERISA § 2(a), 29 U.S.C. § 1001(a). To protect the interests of benefit plan participants and their beneficiaries, ERISA contains provisions prescribing minimum participation and funding standards, ERISA §§ 202, 301–306, 29 U.S.C. §§ 1052, 1081–1086, fiduciary standards for plan managers, ERISA §§ 401–412, 29 U.S.C. §§ 1101–1112, and an insurance program in the event of plan termination, ERISA §§ 4001–4023, 29 U.S.C. §§ 1301–1323.

The Court agrees with the parties that the Welfare Benefit Plan is an "employee welfare benefit plan" as defined by ERISA [15] and that, under ERISA § 4(a), 29 U.S.C. § 1003(a), it is subject to and governed by ERISA. *Eversole v. Metropolitan Life Insurance Co.,* 500 F.Supp. 1162, 1164–65 (C.D.Cal.1980). The Court also agrees that prior state law—including the *Sheehy* rule—has no application of its own force pursuant to ERISA § 514, 29 U.S.C. § 1144, which in part provides:

> (a) Except as provided in subsection (b) of this section, the provisions of this subchapter ["Protection of Employee Benefit Rights" ERISA §§ 2–514, 29 U.S.C. §§ 1001–1114] and subchapter III of this chapter ["Plan Termination Insurance" ERISA §§ 4001–4082, 29 U.S.C. §§ 1301–1461] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

By enacting this section, Congress prempted all state laws relating to employee benefit plans, not merely those state laws aimed at the regulation of areas expressly covered by ERISA. *Wadsworth v. Whaland, supra,* at 77. Indeed, Congress elected to establish pension plan regulation as an exclusive federal concern, circumscribed only by ERISA itself. *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981) (footnote omitted). And this section applies with equal vigor to welfare benefit plans. *Stone & Webster Engineering Corp. v. Ilsley,* 518 F.Supp. 1297, 1300 (D.Conn.1981). From this section and the legislative history relating thereto, in *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1215 (8th Cir. 1981), the court concluded that "Congress intended to 'occupy the field' of employee benefit plans." [16]

Consistent with the theme of reforming the entire field of employee benefit plans, Congress intended that, wherever filed, ERISA cases

> are to be regarded as arising under the laws of the United States in similar fashion to those brought under section 301 of the Labor-Management Relations Act [LMRA].

H.R. Rep. No. 93–1280, 93rd Cong., 2nd Sess., *reprinted in* 1974 U.S. Code Cong. & Ad. News 5038, 5106–07. Under section 301 of the LMRA, 29 U.S.C. § 185, the courts are required to fashion federal rules of decision conditioned by the policy of national labor laws to govern the enforcement of labor contracts. *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 917–18, 1 L.Ed.2d 972 (1947). In this vein, Congress clearly intended that, as respects ERISA cases, federal rules of decision are to apply exclusively, even when ERISA itself furnishes no answer:

> [i]t is also intended that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans.

120 Cong.Rec. S15751 (daily ed. August 22, 1974) (statement of Sen. Javits). *Amato v. Bernard,* 618 F.2d 559, 567 (9th Cir. 1980); *Wayne Chemical Inc. v. Columbus Agency Service Corp., supra.*

---

**15.** See *supra* note 13.

**16.** Similarly, to the extent that *In re Erie Lackawanna Ry. Co.,* 548 F.2d 621 (6th Cir. 1977), may be considered an expression of pre-ERISA federal common law adopting the *Sheehy* rule, it too is superseded by ERISA. *See City of Milwaukee v. Illinois,* 451 U.S. 304, 314–15, 101 S.Ct. 1784, 1791, 68 L.Ed.2d 114 (1981).

 While it is unmistakeably clear, then, that Congress intended that only federal rules of decision be applied to ERISA cases, it is certainly *no less clear* that Congress did not intend that the basic considerations relating to the appropriateness of fashioning a federal rule of decision be disregarded, *i.e.,* where, as here, the subject matter of a case is one of exclusive federal concern, acts of Congress must be scrutinized first and, only after it has been ascertained that no answer lies therein, should resort be had to the development of decisional law, federal common law. *See Amato v. Bernard, supra* at 566. As recently observed by Justice Rehnquist in *City of Milwaukee v. Illinois,* 451 U.S. 304, 313–14, 101 S.Ct. 1784, 1790–1791, 68 L.Ed.2d 114 (1981):

> We have always recognized that federal common law is "subject to the paramount authority of Congress." *New Jersey v. New York,* 283 U.S. 336, 348, 51 S.Ct. 478 [481], 75 L.Ed. 1104 (1931). It is resorted to "[i]n absence of an applicable Act of Congress," *Clearfield Trust,* [318 U.S. 363] at 367, 63 S.Ct. 573 [575], 87 L.Ed. 838, and because the Court is compelled to consider federal questions "which cannot be answered from federal statutes alone," *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 469, 62 S.Ct. 676 [684], 86 L.Ed. 956 (1942) (Jackson, J., concurring). See also *Board of Commissioners v. United States,* 308 U.S. 343, 349, 60 S.Ct. 285 [287], 84 L.Ed. 313 (1939); *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 594, 93 S.Ct. 2389 [2397], 37 L.Ed.2d 187 (1973); *Miree v. DeKalb County,* 433 U.S. 25, 35, 97 S.Ct. 2490 [2497], 53 L.Ed.2d 557 (1977) (Burger, C.J., concurring in judgment)....

Thus instructed, the Court looks to ERISA to determine whether it answers the question at bar, *i.e.,* whether a plan sponsor may exercise its reserved power to terminate an employee welfare benefit plan as against plan participants subsequent to their retirement. Should ERISA fail to furnish an answer, then and only then would an exercise in judicial inventiveness be sanctionable, for "when Congress has 'spoke[n] directly to a question, federal courts are not free to supplement the congressional answer." *L.G. Sager, The Supreme Court, 1980 Term,* 95 Harv.L.Rev. 93, 292 (1981) (*quoting City of Milwaukee v. Illinois, supra,* 451 U.S. at 315, 101 S.Ct. at 1791).

 When construing a statute, the starting point is its language, and if the statutory language is plain and unambiguous on its face, "in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *United States v. Turkeete,* 452 U.S. 576, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (*quoting Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2054, 64 L.Ed.2d 766 (1980)); *United States v. Clark,* —— U.S. ——, 102 S.Ct. 805, 809, 70 L.Ed.2d 768 (1982); *accord Howe v. Smith,* 452 U.S. 473, 101 S.Ct. 2468, 2475, 69 L.Ed.2d 171 (1981); *Rubin v. United States,* 449 U.S. 424, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981).

 A literal reading of ERISA reveals, as contended by WFE and the Committee, that Congress addressed the matter of the vesting of welfare benefits and determined not to require the vesting of such benefits at all. First, and most important in the context of the comprehensiveness of ERISA, there is the express exclusion of welfare plans from the minimum vesting and participation standards. ERISA § 201(1), 29 U.S.C. § 1051(1). The full import of this express exclusion is made clear given the preemption by Congress of state laws relating to all employee benefit plans (ERISA § 514, 29 U.S.C. § 1144), and the unequivocality of the balance of ERISA in respect of exempting welfare benefit plans from regulation. *See, e.g.,* ERISA § 301, 29 U.S.C. § 1081.

In this connection, the exclusion under Treas.Reg. § 1.41(a)–7(a)(ii) (1981) of welfare benefits from "accrued benefits," signifies the uniformity of ERISA's posture. Though deprecated by the Plaintiffs, resort to Treasury Regulations promulgated under IRC § 411 (ERISA § 1053(a)) was made in

*Alessi v. Raybestos Manhattan, Inc., supra,* 451 U.S. at 517–21, 101 S.Ct. at 1903–1905, (wherein the Supreme Court held that offsets in pension benefits for workers' compensation awards were permitted under ERISA, and state law forbidding such offsets were held preempted by ERISA). *See also Baker v. Otis Elevator Co.,* 609 F.2d 686 *passim* (3rd Cir. 1979) (pension plan participant who voluntarily terminated employment before reaching early retirement age specified in plan held not entitled to early benefits under ERISA § 206(a) as interpreted by Treas.Reg. § 1.40(a)–14(–)(3) (1978)). Hence, as respects the affirmative vesting provisions of ERISA, welfare benefits do not vest.

Second, the idea that a lacuna exists in ERISA welfare plan termination is dispelled by ERISA § 403(d)(2), 29 U.S.C. § 1103(d)(2), which, by providing for the manner of distribution of welfare plan assets upon termination, expressly permits welfare plan termination. Were Congress' design otherwise, it would have enacted a complementary program to protect a welfare plan participant's supposed vested benefits analogous to that established throughout ERISA with respect to accrued benefits. Not having done so but having specified the method of welfare plan termination and having exempted Welfare benefits from the minimum vesting provisions, Congress has clearly announced its considered judgment that welfare plans are to remain unregulated in the aspect of vesting, including post termination. *See e.g., United States v. ERIKA, Inc.,* —— U.S. ——, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982) (*citing Lehman v. Nakshian,* 453 U.S. 156, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981); and *Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981)). *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974).

The legislative history is consonant with this view. Despite the assertions of the Plaintiffs to the contrary, ERISA is not purely remedial but rather embodies a compromise reflecting divergent interests. For example, as the House Committee on Ways and Means explained the compromises ultimately contained in the vesting provisions of IRC § 411 (ERISA § 1053(a)):

> In adopting these minimum vesting requirements, your committee was guided by two broad considerations. This first relates to the need to balance the protection offered by the minimum vesting provision against the additional cost involved in financing the plan. Employees, of course, would be accorded maximum protection if they were granted immediate and full vested rights to plan benefits. However, it is generally recognized that a requirement for immediate and full vesting would not be feasible because it would involve such substantial additional costs that it would impede the adoption of new plans and the liberalization of existing ones.

H. Rep. No. 93–807, 93rd Cong., 2nd Sess. *reprinted in* 1974 U.S. Code Cong. & Ad. News 4670, 4685–86. To the same effect, Representative Ullman, upon introducing the conference report on H.R. 2, stated:

> I want to emphasize that these new requirements have been carefully designed to provide adequate protection for employees and, at the same time, provide a favorable setting for growth and development of private pension plans. It is axiomatic to anyone who has worked for anytime in this area that pension plans cannot be expected to develop if costs are made overly burdensome, particularly for employers who generally foot most of the bill. This would be self-defeating and would be unfavorable rather than helpful to the employees for whose benefit this legislation is designed. For this reason, we have been extremely careful to keep the additional costs very moderate.

120 Cong. Rec. H8702 (daily ed. August 20, 1978) (remarks of Rep. Ullman), *reprinted in* 1974 U.S. Code Cong. & Ad. News 5166, 5167.

Thus the Court holds incorrect the assertions (1) that Congress failed to consider broader concepts of vesting, and (2) that its

intent is consistent with full vesting of welfare benefits upon retirement.[17]

■ Finally, the Plaintiffs' claim for breach of fiduciary obligations similarly fails for having been founded on a misreading of ERISA. Although the Welfare Benefit Plan is an "unfunded"[18] plan, it still falls within the scope of the "Fiduciary Responsibility" sections of ERISA.[19] ERISA § 403, 29 U.S.C. 1103, however, provides that "any assets of a plan which consist of insurance contracts or policies" are relieved from the requirement of being held in a trust. The nature of these fiduciary obligations are described as follows:

Although [insurance] contracts need not be held in trust, nevertheless, the person who holds the contract is to be a fiduciary and is to act in accordance with the fiduciary rules of the substitute with respect to these contracts. For example, this person is to prudently take and keep exclusive control of the contracts, and is to use prudent care and skill to preserve this property.[20]

Thus exemplified, the scope of a fiduciary's responsibility *vis-a-vis* insurance contracts not held in trust is limited to safeguarding same. As observed in *Levy,* in such situations the dual loyalty concerns, at the heart of the fiduciary responsibility sections of ERISA, are absent. *Id.* at 969. Accordingly, the Court concludes that the duties imposed upon WFE under ERISA § 404, 29 U.S.C. § 1104, do not preclude of the exercise of a termination clause.

Were ERISA to be construed otherwise, no benefit plan could be terminated. Plainly such result would be anomalous in the context of ERISA as an integrated whole. Hence, the Plaintiffs' claim for breach of fiduciary obligations fails as a matter of law.

The Court has concluded that the claims asserted by the Plaintiffs are without merit and present no genuine issue of material fact, and that Plaintiffs' motion for partial summary judgment on the issue of liability should be denied.

Judgment accordingly.

---

**17.** Since the Court holds that the question of whether welfare benefits vest is answered by ERISA itself, *Shaw v. Kruidenier,* 470 F.Supp. 1375 (S.D. Iowa 1979), and *Landro v. Glendenning Motor Ways, Inc.,* 625 F.2d 1344 (8th Cir. 1980), cited by the Plaintiffs for the proposition that the federal common law to be developed under ERISA should adopt the state rules most solicitous of the welfare of plan participants, *e.g.,* the *Sheehy* rule, are inapposite. Moreover, neither case is similarly postured in that the cause of action in *Shaw* arose before the effective date of the ERISA vesting provisions, 470 F.Supp. at 1382; and in *Landro* the action-

able "acts or omissions" occurred before the premption date of ERISA, 625 F.2d at 1352.

**18.** An "unfunded" plan is one "in which the only assets from which benefits are paid are the general assets of the employer..." S. Rep. No. 93–1127, 94th Cong., 2d Sess. *reprinted in* 1974 U.S. Code Cong. & Ad. News 4838, 4864.

**19.** Joint Explanatory Statement of the Committees of Conference, H. Conf. Rep. No. 93–1280, 94th Cong. 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad. News 5038, 5076.

**20.** *Id,* at 5079.